# EXHIBIT B

Volume 1, Pages 1-89

Exhibits: 1-2

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - - - - - - - - - - - - -

JOSE SEMEDO

        Plaintiff

v.             Docket No. 1:10-cv-11976-RWZ

LON ELLIOTT and CITY OF BROCKTON,

        Defendants

- - - - - - - - - - - - - - - - - - - - - - - - - - -

DEPOSITION OF LON ELLIOTT

Friday, September 23, 2011, 10:21 a.m.

Nutter McClennen & Fish LLP

155 Seaport Boulevard

Boston, Massachusetts

- - - -Reporter:  Kathleen Mullen Silva, RPR, CRR- - - -

kms@fabreporters.com   www.fabreporters.com

Farmer Arsenault Brock LLC

50 Congress Street, Suite 415

Boston, Massachusetts 02109

617.728.4404  fax 617.728.4403

1          MR. HALL:  Or Kathleen LeGrice.

2          MR. PFAFF:  Kathleen.

3     Q.   What were the allegations against you in

4  that complaint?

5     A.   I believe it was that I didn't afford her

6  the opportunity to go to the hospital.

7     Q.   And in the formal complaint that was filed

8  with the Brockton Police Department, were the

9  allegations the same?

10    A.   I don't know.

11    Q.   What's your level of familiarity with how

12 the internal affairs process works in the City of

13 Brockton Police Department?

14    A.   How am I familiar with it?

15    Q.   Or how familiar are you with it?

16    A.   I'm pretty familiar.

17    Q.   What's your understanding of how the

18 process was -- let me be more specific.  How does

19 the process work when someone files a complaint

20 against an officer?

21    A.   Do you want it from start to finish?

22    Q.   Sure.

23    A.   Okay.  If you particularly were to go into

24 the police station and complain about an officer,

FARMER ARSENAULT BROCK LLC

21

1   the officer who hears the complaint first tries to,

2   you know, to dismiss the complaint on its own.  If

3   that doesn't work, then it goes to a supervisor on

4   the shift.  And then the supervisor would speak to

5   the complainant.  And if the complainant still wants

6   to file a complaint, then they are directed to

7   internal affairs.

8       Q.   What happens when it's referred to internal

9   affairs?

10      A.   It goes upstairs to either -- normally

11  there's a captain that's in charge of internal

12  affairs.

13      Q.   And what is that captain responsible for

14  doing, to the best of your knowledge?

15      A.   To the -- well, that captain -- or it could

16  be a -- let me back up.  There's always a captain

17  that's in charge of the internal affairs.  There's

18  other supervisors or patrolmen that work under him

19  that handle the complaints directly.  They do the

20  investigations and they come up with their

21  conclusions, and then they review it with the

22  captain.

23      Q.   At any point is the accused officer

24  notified of the investigation?

1    A.    If the complaint can't -- I should say if

2  the complaint cannot be substantiated, then the

3  officer is never notified.  If the complaint is

4  substantiated, then one of the officers in internal

5  affairs will ask for reports written by the officer

6  who was involved in the incident.

7    Q.    So in regards to the Kathleen LeGrice v.

8  City of Brockton matter were you informed of the

9  complaint against you?

10    A.    Yes, I was.

11    Q.    And to the extent you know, was there an

12  investigation conducted?

13    A.    I believe so, yes.

14    Q.    And what was the result of that

15  investigation?

16    A.    I really don't know.  I know that I had

17  gone to a deposition by City Hall.

18    Q.    And at any point were you ever disciplined

19  for the allegations made against you in that matter?

20    A.    No.

21    Q.    Now, earlier you mentioned in the internal

22  affairs complaint process that the first phase of it

23  is whoever the officer is or the duty supervisor is

24  tries to dismiss the complaint.  What do you mean by

FARMER ARSENAULT BROCK LLC

23

1  that?

2      A.   They try to handle it before it goes

3  upstairs to basically get rid of the complaint.

4      Q.   And when you say "get rid of it," what do

5  you mean?

6      A.   So that it doesn't go any further.

7      Q.   Is that the objective of that officer or

8  that supervisor, to ensure that complaints against

9  officers don't go forward?

10     A.   It's not their objective.   It's kind of

11 like standard policy to try to cover one another.

12     Q.   To the best of your knowledge, is that

13 something that officers are trained on, or is that

14 an unwritten rule or unspoken practice?

15     A.   Unspoken practice.

16     Q.   How do you know about this unspoken

17 practice?

18     A.   I've done it.

19     Q.   How often?

20     A.   I have no idea.   When you're in the police

21 business, there's people constantly complaining.

22     Q.   In regards to you doing that, when you say

23 you have no idea, is there a range of times?

24     A.   It could be as far as, you know, an officer

26

1    your career?

2        A.  Yes.

3        Q.  In the latter part of your career, the more

4    recent referrals, roughly how many times would you

5    have made those referrals, five times?

6        A.  I'd be lying to you if I gave you a number.

7    I can't.

8        Q.  And so am I to understand that the way that

9    the process is set up, the kind of unspoken practice

10   of attempting to get rid of complaints, it's

11   possible that officers could have been complained

12   about and would have never known?

13                   MR. PFAFF:  Objection.

14       A.  Correct.

15       Q.  In those situations -- well, strike that.

16              If a person was to complain about an

17   officer and the complaint -- the immediate officer

18   who took the complaint got rid of it, do you know

19   whether or not there was a practice of letting the

20   officer know -- not formally, but letting him know

21   that someone complained about him?

22       A.  Oh, yeah.  Yeah, I mean verbally.

23       Q.  Right.

24       A.  You know, "So and so was just in the

32

1   Department, was there any training that you went

2   through?

3        A.   An academy in Foxborough.

4        Q.   And what was the nature of the training?

5   What were the things that you were trained on or

6   that were covered?

7        A.   I believe it was a 12- or 16-week police

8   academy given by the State Police.

9        Q.   And in that training, were you all trained

10  in constitutional law?

11       A.   Constitutional, motor vehicle law, yes.

12       Q.   Search and seizure?

13       A.   Yes.

14       Q.   Any training in regards to or relation to

15  racial diversity or racial sensitivity?

16       A.   I don't believe so.

17       Q.   Not at the academy.  And subsequent to your

18  training at the academy, was there any in-service

19  training or any other type of training that you

20  received throughout your career?

21       A.   Yes.

22       Q.   What was the nature of that training?

23       A.   It was to be certified in CPR and first

24  aid, an update on the motor vehicle laws, search and

33

1   seizure, and every year on the last day, they'd

2   have, you know, a guest speaker, either on bombs or

3   tactical teams or things like that there.

4        Q.   And would any of the training involve

5   review of the training manual, City of Brockton

6   training manual?

7        A.   Repeat that, please.

8        Q.   Would any of the training that you attended

9   involve review of the City of Brockton policy

10  manual?

11            MR. PFAFF:   City of Brockton Police

12  Department policy manual?

13            MR. HALL:   I'm sorry.   City of Brockton

14  Police Department policy manual?

15            MR. PFAFF:   I'm not trying to --

16            MR. HALL:   No, no, that's fine.

17       A.   I don't believe so, because there were

18  other cities and towns that attended that academy,

19  you know, the in-service training.

20       Q.   At any point would you have the opportunity

21  to review the City of Brockton Police Department

22  manual?

23       A.   On my own time?

24       Q.   Sure.

FARMER ARSENAULT BROCK LLC

34

1    A.   Yeah.   I mean, everything's there, yeah.

2    Q.   Was that a regular practice of yours, to

3  review the policy manual?

4    A.   No.

5    Q.   Did you ever review the City of Brockton

6  policy manual?

7    A.   I think when you first got on, it was

8  all -- it all was gone over at the -- you do two

9  weeks upstairs before you go out on the road, to go

10  over reports, policies and procedures, things like

11  that.

12   Q.   That was when you first started?

13   A.   Right.

14   Q.   That was an initial training so to speak?

15   A.   Yes.

16   Q.   After that, there was no subsequent follow-

17  up, training or in-service training specifically

18  related to policies and procedures of the Brockton

19  Police Department?

20   A.   No.

21   Q.   In regards to the training you received in

22  relation to warrant arrests, where was that -- what

23  was that training?

24   A.   I don't think there was any training.   I

35

1   think it was explained to you at the academy.  I

2   mean, when you got on the job you were taught by an

3   officer.  He had a training, you know -- he was more

4   or less a training officer, so you learn from him.

5   You were put in different jobs, dispatch, things

6   like that there.  So you learned these things as you

7   went on.

8       Q.   So on-the-job training?

9       A.   Correct.

10      Q.   And was that on-the-job training ever

11  pursuant to any type of training manual or the

12  policy and procedure manual for the City of Brockton

13  Police Department?

14      A.   Don't know.

15      Q.   And do you ever recall an officer -- your

16  training officer making reference to the policy

17  manual?

18      A.   No.

19      Q.   This was more kind of on-the-job training

20  based on their experience, sharing it with you?

21      A.   Correct.

22           (Marked, Exhibit 2, excerpts of policy

23  and procedure pre 2008.)

24      Q.   Mr. Elliott, I'm showing you a segment of

FARMER ARSENAULT BROCK LLC

36

1   some of the documents we received from the City of

2   Brockton pursuant to our discovery requests that

3   cover some of the policy and procedures before 2008.

4   Does this look familiar to you?

5       A.   Where did they come up with this?  I don't

6   know.

7       Q.   So it's your testimony you've never seen

8   any of that information before?

9       A.   No.  I mean, that's just something given

10  out of a -- probably internal affairs came up with

11  this.

12      Q.   And so is it your testimony that that is

13  something that the city does not -- the police

14  department does not have or does not use?

15      A.   I mean, the problem with the policies and

16  procedures, it was a lot thicker than this.  There

17  was more to do with it than this.

18      Q.   Sure.  Like I said at the outset, that's a

19  segment or a portion of a larger set of documents

20  that we received.

21      A.   Yeah.  I believe this is something that you

22  get on the first day when you show up at the

23  station.

24      Q.   But it's nothing -- to the best of your

37

1    recollection, that's nothing that you would

2    regularly review?

3        A.   No.

4        Q.   That's not anything that you would use or

5    make reference to?

6        A.   No.

7        Q.   All right.  And so is there -- either in

8    your on-the-job training or any of the training that

9    you attended, in-service trainings, was there ever

10   any discussions about the level of priority of

11   warrants?

12       A.   Priority of warrants.

13       Q.   Right.  If there was a way to categorize

14   warrants as a high priority, medium priority or low

15   priority?

16       A.   No.  There's foreign warrants, there's

17   default warrants, there's straight warrants, and

18   there's -- I can't think of the name, but -- capias

19   warrants.

20       Q.   Capias warrants.  Okay.  If you could, on

21   Exhibit 2, if you could turn to what's listed as

22   page 2-9.

23       A.   Okay.

24       Q.   Do you see on that a breakdown of

40

1    Q.   Were there any particular officers that he

2    was consistently in contact or communication with,

3    to your knowledge?

4    A.   I have no idea.

5    Q.   Prior to November 20, you weren't aware of

6    any criminal history of Mr. Semedo?

7    A.   No.

8    Q.   But at some point you found out that he had

9    warrants in the system?

10   A.   Correct.

11        MR. PFAFF:  I'm sorry.  What was the

12   question?

13        MR. HALL:  Warrants in the system.

14        MR. PFAFF:  Warrants.  Thank you.

15   Q.   And how did you find that out?

16   A.   I ran his name.  I didn't.  Dispatch did.

17   And checked to see if there were any warrants.

18   Q.   What did dispatch come up with?

19   A.   They told me that there was a Q1 warrant,

20   and there was nothing in the WMS, warrant management

21   system.

22   Q.   And can you describe or explain the Q1

23   versus warrant management?

24   A.   I believe warrant management is one of the

FARMER ARSENAULT BROCK LLC

41

1   -- it's one or the -- the Q1 system is either just

2   statewide and the WMS system is United States wide,

3   one or the other.  I'm not sure.

4       Q.   And what was the reason for you to run his

5   name?

6       A.   To run his name, because I was told by

7   George Carney and Thomas Clifford that Jose had

8   warrants out on him.

9       Q.   Why were they telling you that he had

10  warrants out?

11      A.   Because he owed them money.

12      Q.   And they informed you that he had a warrant

13  for the money he owed them?

14      A.   Yes, he had warrants.  That they had gone

15  to Taunton District Court, filed complaints and then

16  took the warrants out.

17      Q.   How many complaints did they file?

18      A.   I don't know.

19      Q.   Are either of those individuals Brockton

20  police officers?

21      A.   What's that?

22      Q.   Are either of those individuals Brockton

23  police officers?

24      A.   No.

FARMER ARSENAULT BROCK LLC

42

1    Q.   And what's your relationship with them?

2    A.   Today?

3    Q.   At that time.

4    A.   At that time I was friendly with them.

5    Q.   When you contacted dispatch -- well, let me

6    ask you this:  Is there a way of tracking what

7    inquiries dispatch makes?

8    A.   Say that again.

9    Q.   Is there a way of tracking the inquiries

10   that dispatch makes?

11   A.   Yes.

12   Q.   And how's that?

13   A.   Through the national database, I believe.

14   Q.   So when dispatch makes an inquiry either to

15   an individual or a motor vehicle, there'll be some

16   record of that?

17   A.   Correct.

18   Q.   When did you make that inquiry to dispatch

19   regarding Mr. Semedo?

20   A.   I believe the same night that I went there.

21   Q.   And when you say "there," where do you

22   mean?

23   A.   On the Roll.

24   Q.   How did you know he'd be there, Mr. Semedo?

43

1      A.   The Carneys.

2      Q.   And did the Carneys ask you to do anything?

3      A.   They asked me if I could grab him on the

4   warrants.

5      Q.   Did they say why?

6      A.   That he owed them money, that there were

7   warrants out of Taunton District Court.

8      Q.   And that was in relation to the money he

9   owed them?

10     A.   Correct.

11     Q.   Did they tell you how much that he owed

12   them?

13     A.   Somewhere around $5,000.

14     Q.   Do you recall what time you made the

15   inquiry to dispatch?

16     A.   No.

17     Q.   Do you recall what your shift was that

18   night?

19     A.   Midnight to 8:00.

20     Q.   So the first half?

21     A.   Yes.

22     Q.   What were your responsibilities or -- your

23   general responsibilities that night as sergeant?

24     A.   Patrol supervisor.

44

1       Q.    How many officers were on the first half

2   that night, to the best of your recollection?

3       A.    Six, eight, maybe more.

4       Q.    And is it fair to say at roll call you see

5   all of those officers?

6       A.    Correct.

7       Q.    And at roll call had you -- by the time you

8   were at roll call, had you made the inquiry to

9   dispatch?

10      A.    I don't believe -- I don't know.  I don't

11  believe so.

12      Q.    When specifically did the Carneys reach out

13  to you asking you to pick up Mr. Semedo?

14      A.    Days, a week before.

15      Q.    And prior to November 20, you didn't make

16  any inquiries into Mr. Semedo?

17      A.    One more time?

18      Q.    Prior to the 20th, you didn't make any

19  inquiries into Mr. Semedo?

20      A.    I could have.  I don't recall.

21      Q.    Who is George Heikel?

22      A.    George Heikel owned a restaurant and he was

23  a personal friend of mine.

24      Q.    And at what point did you pick him up?

FARMER ARSENAULT BROCK LLC

56

1     Q.   Is this a gesture that you've ever -- well,

2  strike that.

3           What specifically was the gesture that

4  you made?

5     A.   It was the lowering of my lip like this and

6  scratching under my arm like that.  (Indicating.)

7     Q.   Just so the record is clear when you say

8  "like this," you're putting your left hand on top of

9  your head?

10     A.   Left hand on my head, right hand underneath

11  my armpit.

12     Q.   Was there any particular way that you were

13  walking when you were making that gesture?

14     A.   No.  I was just standing there.

15     Q.   And that gesture that you made was directed

16  towards the other officers?

17     A.   Yes.

18     Q.   You would agree that despite your personal

19  beliefs about it, that gesture is racially

20  offensive?

21     A.   If I had done it to him, yes.

22     Q.   So what you're saying is that because he

23  couldn't see it, it wasn't racially offensive?

24     A.   To my belief, if he didn't see it, no.

FARMER ARSENAULT BROCK LLC

57

1    Q.  Have you ever made that gesture before?

2    A.  Yes.

3    Q.  When?

4    A.  I don't know.

5    Q.  Do you recall ever making that gesture

6 while being employed as a Brockton police officer?

7    A.  Probably, yeah.

8    Q.  Would it have been while you were on duty?

9    A.  Yes.

10    Q.  And would it have been in the presence of

11 other officers?

12    A.  Officers that I felt that I could do it

13 with, yes.

14    Q.  When you make reference to officers that

15 you could do that with, what do you mean by that?

16    A.  Officers that would laugh about it, we'd

17 joke about it or whatever it may be.

18    Q.  Officers that would laugh and joke about it

19 with you?

20    A.  Yeah.  I mean, there's plenty of officers

21 down there that do the same thing.

22    Q.  When you say "plenty of officers," how

23 many?

24    A.  I think -- I mean, we're getting into an

58

1   area that, I mean, I feel that everybody has in

2   today's society in one way or the other, whether

3   it's joking, it's meaningful, not to hurt somebody.

4   It's all over the Internet, things like that there.

5   It's not -- there's no harm meant by it.

6       Q.   Sure.  But my question was how many

7   officers?

8       A.   I would have to say that every officer down

9   there has either used the word or used a racial word

10  either in a report talking to someone else or -- I

11  would have to say everyone.

12      Q.   When you say officers have used the word or

13  a racial word, were there specific racial words that

14  you're referencing?

15      A.   There's several.  I mean, not specifically

16  picking out one, no.  But I mean as far as jokes,

17  things on the Internet they passed around.

18      Q.   You indicated that -- or if I'm wrong,

19  correct me, that officers may have used it in

20  reports?

21      A.   Yeah.  I mean, they've used the N word in

22  reports.  It's --

23      Q.   I'm sorry.  Go ahead and finish.

24      A.   Only by certain things, that if they made

FARMER ARSENAULT BROCK LLC

59

1  an arrest of, say -- say a white person was mouthing

2  off and used the N word, he would list it in his

3  report, whatever it may be.

4      Q.   So it would be recording the use of the

5  word by someone else?

6      A.   Excuse me?

7      Q.   So the officer would be recording the use

8  of the word by someone else?

9      A.   Right.  Correct.

10      Q.   Would there be any instances where officers

11  would use the words themselves in a report?

12      A.   I was there for 24 years.  I've heard it,

13  of course.

14      Q.   And hearing the word or use of the N word

15  or any other racial epithets, is that something that

16  you would hear in the department?

17      A.   Yes.

18      Q.   And would it be something repeated by

19  officers who were on duty?

20      A.   Give me that again.

21      Q.   Would that word or any racial epithets be

22  used or repeated by officers who were on duty when

23  they used it?

24      A.   Yes.

60

1    Q.   Would supervising officers ever be around?

2         MR. PFAFF:  Objection.

3    A.   Probably, yeah.

4    Q.   It's fair to say that as a sergeant, you

5    are a superior officer?

6    A.   Correct.

7    Q.   And as a superior officer, you have certain

8    duties and responsibilities?

9    A.   Correct.

10   Q.   Generally speaking, what are your duties

11   and responsibilities, or what were your duties and

12   responsibilities as a superior officer?

13   A.   Superior officer was a patrol supervisor.

14   If they needed me, make command decisions.

15   Q.   Did you have any duties or responsibilities

16   in regards to officer conduct?

17   A.   I mean, if it was being done right in front

18   of me, yeah, I'd stop it.

19   Q.   Have you ever stopped the use of racial

20   epithets that were done in front of you?

21   A.   No.

22   Q.   In regards to these racial epithets that

23   you've heard or make reference to today, had you

24   ever heard anyone use the term "African jungle

FARMER ARSENAULT BROCK LLC

61

1  bunny"?

2      A.   No.

3      Q.   What's your understanding of what that

4  means?

5      A.   I have no idea.

6      Q.   In regards to the gesture that you made on

7  the night you arrested Mr. Semedo, do you recall

8  instances where you had made that gesture before?

9      A.   Yes.

10     Q.   When would that be?

11     A.   With Officer Healy, Lieutenant Barry.  We

12  were good friends at the time.  Of course Officer

13  Healy's denied it at the City Hall meeting that he's

14  ever done it.  I mean, when you're friends and

15  you're out, or even if you're in uniform and you see

16  something or whatever, you might joke about it.

17     Q.   And do you recall specific instances where

18  you all either in uniform or on duty either made

19  that gesture or...

20     A.   I mean, it could have been going to a group

21  of kids or whatever and -- I'm just giving you an

22  example.  I mean, it's -- you could go to a scene

23  where there's a group of individuals there, and you

24  send them all on their way and as you're going back

FARMER ARSENAULT BROCK LLC

62

1   and you're talking or whatever, you know, Officer

2   Healy might have said, you know, these -- lower his

3   lip and say, "There goes the Negroes," or, you know,

4   it would be a -- things like that there.

5       Q.   And you mentioned a lieutenant that you

6   would be in the presence of.  I didn't catch the

7   name.

8       A.   Lieutenant Barry.

9       Q.   Lieutenant Barry.  And Lieutenant Barry was

10  someone at the time you had a friendship with?

11      A.   Yes.

12      Q.   And this is also someone who you would make

13  that gesture in front of or who would make that

14  gesture?

15      A.   Right.

16      Q.   And this would occur while you all were on

17  duty?

18      A.   On duty, off duty.  We also had a friend,

19  Darvin Anderson, who is black, and we used to kid

20  with him about, you know, certain black things, and

21  towards of end of my career, Darvin had said to me,

22  you know, "I'm starting to feel a little offended."

23  I said, "That's perfectly fine," and we stopped.

24      Q.   And just for the record, how do you spell

FARMER ARSENAULT BROCK LLC

74

1   that they fired me because they felt because I made

2   monkey gestures I must have said what I said to

3   Jose.   That was in the findings of the hearing

4   through D'Ambrose, D-'-A-m-b-r-o-s-e.

5      Q.   And was that part of the reason why you

6   filed that -- or had your attorney file that

7   particular motion?

8      A.   Yes.

9      Q.   So was it your belief that your termination

10  for those reasons was unfair because other officers

11  had done similar things and not been terminated or

12  disciplined?

13     A.   As far as racial things?

14     Q.   Yes.

15     A.   Yes.

16     Q.   And was there particular evidence or

17  information that you were prepared to provide the

18  Civil Service Commission to support that?

19     A.   Say that again, please.

20     Q.   Sure.   Was there any type of -- what was

21  your proof of that?

22          MR. PFAFF:   I'm sorry.   Proof of what?

23     Q.   What was your proof that other officers did

24  the same thing and were not terminated?

FARMER ARSENAULT BROCK LLC

82

1          EXAMINATION

2   BY MR. PFAFF:

3       Q.   Mr. Elliott, you testified earlier that

4   there were other officers who had in the course of

5   your career used racial epithets, and my question to

6   you is, do you know the names of those officers?

7       A.   William Healy, H-e-a-l-y, Mark Celia,

8   C-e-l-i-a.  I mean older guys back in the day, but,

9   I mean, they're all retired and stuff, so.

10      Q.   Names, please.

11      A.   I mean, they're all retired.  I really

12  don't want to give retired guy's names, but guys

13  that are presently on the job, I mean, Pat O'Malley

14  was one of them.  He's no longer on the job.

15      Q.   My question to you is any police officer.

16  It doesn't make any difference whether he's retired

17  or currently working.

18      A.   (Witness reviewing documents.)  Oh, Dick

19  Linehan.  I remember him being down at the range.

20      Q.   Is he current or retired?

21      A.   Yeah, he's current.  I remember him down at

22  the range.  And you got to push off on the target

23  and fire some rounds.  And he pushed it off and said

24  "Deval Patrick."  So I remember that, but...

FARMER ARSENAULT BROCK LLC

83

1      The other thing too is it does happen.

2  It's -- you know, you're chasing a car, you're

3  chasing somebody through the woods, does it slip up,

4  does it come out?  Of course it does.  We all know

5  that.  So for somebody to say that they haven't used

6  minority words or racial epithets, I'd have to call

7  you a liar to your face, whether you're with your

8  friends, whether you're out with family, wherever

9  you are, wherever it is, whether it's on the

10  Internet, whether it's a joke or whatever it may be.

11  It's reality.  It's our society today.

12      Q.   Any other episodes besides the ones you

13  named?

14      A.   Not that I can think of.

15      Q.   You mentioned earlier with respect to

16  Attorney Hall's questioning that if you were the

17  receiving officer of a complaint from a citizen,

18  that it was in your discretion as the receiving

19  officer to determine what to do with that oral

20  complaint before it got into writing?

21      A.   I wouldn't say that it was my discretion.

22  I would have to say it would be up to the discretion

23  of the supervisor and what he does with it.  I'll

24  tell you right now that you know who you work with.

FARMER ARSENAULT BROCK LLC

84

1  So if I'm a supervisor and somebody comes in to

2  complain about a guy that I don't like, then you

3  send them to internal affairs.  If you like the guy,

4  you try to get rid of it.

5      Q.  Do you recall ever trying to get rid of

6  anybody who came in to complain about an officer

7  using a racial epithet or making a racial gesture?

8      A.  I don't have names or anything else.  I

9  know that people come to the police station for

10  help.

11      Q.  Right.  But I didn't ask you that, though.

12  My question was pretty specific.

13      A.  Racial epithets.

14      Q.  Yes.

15      A.  Have I ever witnessed that.

16      Q.  No, not if you ever witnessed it.  The

17  question is, have you ever been on the receiving end

18  of a complaint and the coming into the office to

19  complain that an officer has used a racial epithet

20  or a gesture?

21      A.  I'm sure I have at one time or another.

22      Q.  Do you have any memory right now?

23      A.  No.

24      Q.  Okay.  The next question is, have you ever

87

1    A.  I wouldn't -- I mean, do you get them on

2 the phone?  Yeah.  You get them on your phone.

3    Q.  But specifically in regards to e-mail did

4 you ever receive those --

5    A.  I don't even think I had an e-mail address.

6 I wouldn't even know how to check it.

7    Q.  Were you aware of any officers who sent or

8 received racially inappropriate e-mails in the

9 department?

10    A.  I don't know.

11    Q.  But you indicated that there was

12 information exchanged over the Internet or e-mail

13 that was racially insensitive?

14    A.  No.  I'm saying that all the interracial

15 things and things like that there that are on the

16 Internet today.  I'm not saying as far as the

17 Brockton Police Department, but I'm saying as far as

18 jokes, it's, you know...

19    Q.  Okay.

20    A.  You have to add Perez to that, P-e-r-e-z.

21        MR. PFAFF:  Add to what?

22        THE WITNESS:  Chris Perez, racial

23 things.

24        MS. LEACH:  What was his first name?

FARMER ARSENAULT BROCK LLC