# EXHIBIT D

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

C.A. NO. 1:10-CV-11976-RWZ

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

JOSE SEMEDO,

     Plaintiff,

v.

LON ELLIOTT and CITY OF BROCKTON

     Defendants.

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

CONTINUED DEPOSITION OF EMANUEL GOMES

January 5, 2012

10:00 a.m.


NUTTER MCCLENNEN & FISH LLP

155 Seaport Boulevard

Boston, Massachusetts


Reporter:   Tracy Coffman



**EcoScribe Solutions**

www.EcoScribeSolutions.com

888.651.0505

1      documents, and I'm going to mark that as

2      Exhibit 28.

3                  (Exhibit No. 28; so marked.)

4   Q.  I'll let you look through that.

5   A.  Okay.

6   Q.  I'm really interested in the first seven

7      pages, the handwritten pages there, do you

8      recognize those?

9   A.  I do.

10  Q.  What is that?

11  A.  It appears to me that this is a handwritten

12      chronological order of internal affairs

13      complaints received.  The best I can make

14      out, this would consist of the name of the

15      officer that the complaint was against, and

16      the other name, across from it, would be the

17      complaining party.  Sometimes it's not a

18      person, it might be an agency, another

19      agency.

20  Q.  Did you write this?

21  A.  No, I did not.  That is not my writing.

22  Q.  Who did?

23  A.  It appears to be Sergeant Stanton's

24      handwriting, but I cannot be sure, but it

1      appears to be.

2  Q.  Did you speak with Sergeant Stanton about his

3      preparation of this and how he did it?

4  A.  I spoke to him about his preparation in

5      preparing to get some of this data, but not

6      this item in particular.

7  Q.  Is this a complete list of complaints for

8      these years 1996 through 2009?

9  A.  I would say that it is, because that was his

10     clear directive.

11 Q.  The Narcisse complaint was made in 2002, on

12     page six the 2002 complaints appear, I'll ask

13     you if you see the Narcisse complaint there?

14 A.  In that small group that's marked 2002, I do

15     not see it there.

16 Q.  So this isn't a complete list of the IA file

17     complaints, is it?

18 A.  I would still say that it is, because

19     Sergeant Stanton had a clear directive.  And

20     the person who handled that prior complaint,

21     Sergeant Leary, he predated Sergeant Stanton.

22     Sergeant Stanton was clearly given a

23     directive to produce anything that was in our

24     files.

1  Q.  I have of copy of the Narcisse complaint from

2      your files, so it's fair to say that Sergeant

3      Stanton may have missed at least one

4      complaint, correct?

5  A.  He may have, this is generated handwritten.

6      You know, if we have it in our files, it

7      should have been compiled here.

8  Q.  What are the numbers next to each line, it

9      appears to be the year and then another

10     number, I don't know what that is?

11 A.  I don't know what that is.

12              MR. PFAFF:  Are you referring to

13     the number after the dash?

14 Q.  Yes.  You don't know what that is?

15 A.  I do not.

16 Q.  When were you notified that you were expected

17     to appear at this continued deposition?

18 A.  A matter of days ago.

19 Q.  I'm going to hand you what is the notice of

20     deposition from the original deposition, it

21     hasn't changed from this one.  It's

22     Exhibit 1.

23              It's a 30(b)(6) designation to the

24     city, and there's a list of topics to be

```
 1            for about another week.
 2     Q.     So who did you speak with?
 3     A.     The only preparation that I did for this is I
 4            read, as I stated before, the Elliott file,
 5            okay.  A lot of this is my operating
 6            knowledge that I have of a division that
 7            falls under me.  A lot of this is delegated
 8            to Sergeant Stanton.  But I do have a
 9            functional knowledge of day-to-day
10            activities.
11                   You know, with 185 sworn personnel,
12            it's impossible for me to have absolute
13            knowledge of exactly what's in everyone's
14            file.
15     Q.     What documents did you review for today?
16     A.     The only documents that I've reviewed from
17            today were, as I said, the Semedo complaint
18            and the Semedo file.
19     Q.     What's the IMC in house computer system?
20     A.     The IMC in house computers are our operating
21            data base.  IMC handles all of our dispatch
22            operations, our record keeping operations,
23            and maintains all of our data base.
24     Q.     Who maintains that?
```

1    someone is arrested on a warrant, there isn't

2    necessarily a transmission made just prior to

3    the arrest taking place, but the officer has

4    knowledge.

5  Q.    In this instance, there wasn't a copy of a

6    warrant prior to the arrest?

7  A.    I don't believe that there was, right.

8  Q.    But it's the city's position that Mr. Elliott

9    had knowledge there was some warrant

10    outstanding, correct?

11  A.    Yes.

12  Q.    When the booking officer went and checked, he

13    found that there was no outstanding warrant

14    for Mr. Semedo at the time of the arrest,

15    correct?

16  A.    In the system that he looked in, there was

17    not, I think I explained at the last.

18  Q.    The Q1 system?

19  A.    Right, the Q1 system predates WMS, right, if

20    you can understand that.  And the Q1 system

21    did not automatically transfer into the WMS.

22    So it is possible that someone would have an

23    outstanding warrant, an old warrant in the Q1

24    system, which goes back my entire career, at

1    phone call to the department that is seeking

2    that individual, to see if they still have,

3    because under the Q1 system, the warrant had

4    to be physically in hand.  So if you're

5    dealing like in the early morning, you would

6    have to call a neighboring community and say,

7    do you have the warrant in hand?  And

8    sometimes they did, and sometimes they

9    didn't, and then an arrest wouldn't take

10   place, but that's no longer the case with

11   WMS.

12   Q.   So a locate on a Q1 warrant would indicate

13        whether it's been recalled?

14   A.   Correct.

15   Q.   Was a locate run on the warrant listed on Mr.

16        Semedo's arrest booking report, before he was

17        taken into custody?

18   A.   Prior to him being taken in custody, I don't

19        believe it was.

20   Q.   Does the city have any reason to doubt the

21        truth of booking Officer Kelp's (sic)

22        statement to the effect that the warrant

23        listed as the basis for Mr. Semedo's arrest

24        had been recalled prior to the arrest?

1   A.   I believe that Officer Kelp was being

2       factual, checking in the WMS system.  I don't

3       think it's clear that he looked in the Q1

4       system.

5   Q.   I have a copy of Kelp's statement from his

6       interview -- never mind.

7             If the officers had discovered,

8       before going into On a Roll and taking Mr.

9       Semedo into custody, the warrant in the Q1

10      system had been recalled, would they still

11      have been authorized to enter On A Roll and

12      take him into custody?

13  A.   It wouldn't be consistent with what we would

14      do.  Once a warrant has been recalled, there

15      would be no action taken.

16  Q.   Why is that?

17  A.   It would be a clear indication that the

18      person has been surrendered somehow, whether

19      voluntarily or otherwise, to the court that

20      was looking for him, so the warrant would no

21      longer be active.

22  Q.   So there wouldn't be any reason to go into On

23      A Roll and take him into custody?

24  A.   If the officers had knowledge that there was

1    phone call to the department that is seeking

2    that individual, to see if they still have,

3    because under the Q1 system, the warrant had

4    to be physically in hand.  So if you're

5    dealing like in the early morning, you would

6    have to call a neighboring community and say,

7    do you have the warrant in hand?  And

8    sometimes they did, and sometimes they

9    didn't, and then an arrest wouldn't take

10   place, but that's no longer the case with

11   WMS.

12  Q.   So a locate on a Q1 warrant would indicate

13       whether it's been recalled?

14  A.   Correct.

15  Q.   Was a locate run on the warrant listed on Mr.

16       Semedo's arrest booking report, before he was

17       taken into custody?

18  A.   Prior to him being taken in custody, I don't

19       believe it was.

20  Q.   Does the city have any reason to doubt the

21       truth of booking Officer Kelp's (sic)

22       statement to the effect that the warrant

23       listed as the basis for Mr. Semedo's arrest

24       had been recalled prior to the arrest?

```
 1   Q.    The last time we spoke, you weren't aware of

 2         any complaints made against Mr. Elliott

 3         during his service in Brockton other than

 4         Mr. Semedo's complaint, correct?

 5   A.    Correct.

 6   Q.    At that time you had only reviewed the IA

 7         files for the Semedo complaint and Elliott's

 8         personnel file, correct?

 9   A.    Correct.

10   Q.    What's the city done to investigate the

11         existence of other complaints made against

12         Mr. Elliott?

13   A.    Are you talking about prior employment or

14         during?

15   Q.    During?

16   A.    The best that I could see, there weren't any

17         other complaints.

18   Q.    What did the city do to investigate that?

19   A.    If those complaints existed, it would be in

20         the internal affairs file.

21   Q.    Under Elliott's name?

22   A.    Under Elliott's name.

23   Q.    And if there were complaints against Mr.

24         Elliott that didn't make it into the IA
```

1       files, there may have been complaints against

2       Mr. Elliott that made it into the law

3       department files, correct?

4  A.   I don't know of any such case.  But I don't

5       know what's in there files, I can only tell

6       you what's in the Brockton police department

7       file.

8  Q.   You didn't look at the law department files?

9  A.   No.

10  Q.   Did you talk to anyone about what might be in

11       the law department file?

12  A.   I did not, and I didn't even know that they

13       had their own file, and I don't have access

14       to it.

15  Q.   If Mr. Elliott were present during an

16       incident where a formal complaint was made,

17       but he wasn't the officer whose conduct was

18       complained about, would that information be

19       in his IA file?

20  A.   I can tell you that sometimes complaints come

21       in against more than one officer, the

22       complaint might come in against every officer

23       at the scene, and I can tell you that a copy

24       of the complaint will be in everyone's file.

1          record of their involvement in the incident?

2   A.    It would contain a record of the letters that

3          they were ordered to write, their written

4          responses, but as I said earlier, they were

5          not party to complaint.  They were not party

6          to Mr. Semedo's complaint.  In fact, Mr.

7          Semedo never complained about them, and

8          actually, he lauded the conduct of the other

9          officers.

10  Q.    Is there any record of Mr. Elliott ever

11         having reported misconduct by another

12         officer?

13  A.    Of him doing the reporting?

14  Q.    Yes?

15  A.    I don't believe so, at the internal affairs

16         level.

17  Q.    If it were at another level, where would

18         those records be?

19  A.    I just know that he had issues with a couple

20         of officers when he was in the detail office,

21         but I don't think that those rose to the

22         level of bringing it to internal affairs.

23  Q.    If you were going to look for a report or a

24         record of a report by Elliott against another

1      officer, would you look in his file or in the

2      other officer's file?

3   A.   For us to have a record of it, it's our

4      protocol in the police department, Sergeant

5      Elliott as an example, as a ranking officer,

6      would have to generate a report and send it

7      by the chief's office, and then the officer

8      he was complaining about would be dealt with

9      at whatever level.  It would depend on the

10     situation, but it would incumbent upon

11     Sergeant Elliott to reduce it to writing.

12          Now he may have handled something

13     verbally with a subordinate on a shift or

14     through his office, in the detail office, but

15     there wouldn't necessarily be a record of

16     that.

17  Q.   If he did it in writing, would it be in his

18     IA file?

19  A.   It would be in the officer that he complained

20     about, yes.

21  Q.   Okay, it would be the officer that he

22     complained about, but not in his own?

23  A.   Correct.

24  Q.   Have you reviewed the city files for records

| | | |
|---|---|---|
| 1 | | where Mr. Elliott made a report about |
| 2 | | misconduct against another officer? |
| 3 | A. | I don't know of any case that he brought |
| 4 | | forward in writing to the level of internal |
| 5 | | affairs.  I don't know if there's a single |
| 6 | | case that he did. |
| 7 | Q. | Did you check the files for those? |
| 8 | A. | No, I did not. |
| 9 | Q. | Did anyone? |
| 10 | A. | I don't know. |
| 11 | Q. | You're familiar with the cities methods, |
| 12 | | procedures and practices, for creating, |
| 13 | | retaining and maintaining records, of formal |
| 14 | | and informal complaints, alleging misconduct |
| 15 | | by Brockton police officers, correct? |
| 16 | A. | Yes. |
| 17 | Q. | And not every complaint goes to IAD, right? |
| 18 | A. | Correct. |
| 19 | Q. | But your knowledge includes records of |
| 20 | | incidents that make it to IAD and those that |
| 21 | | don't, correct? |
| 22 | A. | My knowledge is of the ones that rise to the |
| 23 | | level to come into internal affairs.  There |
| 24 | | are and have been minor things on the shift |

| | | |
|---|---|---|
| 1 | | that are handled at that level.  Some minor |
| 2 | | complaints might be settled before they come |
| 3 | | to internal affairs. |
| 4 | Q. | But you don't have knowledge of records of |
| 5 | | incidents that don't come to IAD, they go |
| 6 | | maybe directly to the law department? |
| 7 | A. | If it went directly to the law department, I |
| 8 | | wouldn't have knowledge of that. |
| 9 | Q. | Who would? |
| 10 | A. | The law department. |
| 11 | Q. | So someone else in the city? |
| 12 | A. | Correct, I can only tell you about the ones |
| 13 | | that are received in internal affairs. |
| 14 | Q. | And you don't have access to the law |
| 15 | | department files? |
| 16 | A. | I don't have knowledge or access. |
| 17 | Q. | And you haven't talked to anyone who does? |
| 18 | A. | No, I have not. |
| 19 | Q. | The last time we spoke, I asked you about |
| 20 | | complaints and records of incidents of |
| 21 | | alleged discrimination between 1996 and 2011, |
| 22 | | do you remember that? |
| 23 | A. | Yes. |
| 24 | Q. | And you hadn't investigated the city's files |

1          for those records, correct?

2   A.     Correct.

3   Q.     Since that time, have you done anything to

4          become familiar with the records in the

5          city's files that concern incidents of

6          alleged discrimination?

7   A.     No, I don't have access to those.

8   Q.     Who does?

9   A.     I don't know.  I don't know what files are

10         kept elsewhere, within the law office or

11         otherwise, I only know the ones that are

12         maintained by the department.

13  Q.     Do you recall our discussion of the incident

14         involving Lon Elliott and Detective Ernest

15         Bell?

16  A.     Yes.

17  Q.     And you first became aware of that incident

18         during the investigation of Mr. Semedo's

19         arrest, right?

20  A.     Correct.

21  Q.     Have you reviewed the city's files for a

22         record or report of that incident?

23  A.     As it pertains to the Lon Elliott file, yes.

24  Q.     Where did you look?

1   A.   In the internal affairs file, everything that

2        pertains to Lon Elliott.

3   Q.   Did you check Officer Healy's file?

4   A.   No, I did not, but I don't believe that

5        Officer Healy was part and parcel to that

6        complaint, or that a complaint was even made

7        officially at the time.

8   Q.   But Officer Healy has testified that he was

9        present and observed the incident, correct?

10  A.   Correct.

11  Q.   And there is no record of any report by

12       Officer Healy of that incident, correct?

13  A.   I think there was a report at the time.

14  Q.   Officer Healy, as an officer who observed the

15       incident, never reported it, did he?

16  A.   I don't believe that he did.

17  Q.   Do you think he should have?

18               MR. PFAFF:  Objection, you can

19       answer.

20  A.   I wasn't there.

21  Q.   The department has a hierarchy of internal

22       reporting, correct?

23  A.   Yes.

24  Q.   To police its own conduct, the conduct of its

1      own officers?

2   A.   Yes.

3   Q.   Do you think Officer Healy, by not reporting,

4      followed that internal reporting process?

5   A.   Based on what I know, and I haven't spoken

6      with Officer Healy, and in fact, Detective

7      Bell works for me now, I've never discussed

8      it with him.  I don't really have enough

9      knowledge to determine that, about what

10     happened at the scene.  And the internal

11     affairs today is different than decades ago.

12  Q.   That's your personal opinion?

13  A.   Solely my personal opinion.

14  Q.   What would the city's opinion be?

15             MR. PFAFF:  Objection.

16  A.   They may differ.

17  Q.   Are you familiar with the cities methods,

18     procedures and practices for tracking the

19     incidents of complaints of misconduct,

20     harassment or discrimination by police

21     officers and employees?

22             MR. PFAFF:  Objection to the form.

23     Do you mean complaints made by police

24     officers and employees or complaints made of

1      apprehensive of police.  I think that there

2      was also some legal status issues.  And we

3      did not get any obstruction in the

4      investigation, but people were hesitant to

5      cooperate, and it took us a little while to

6      seek out all the victims.

7   Q.   During that investigation, did you interview

8        any other officers?

9   A.   As it pertained to Mr. Dara?

10  Q.   Yes.

11  A.   Mr. Dara rode alone, so he was not.  I

12       remember that his supervisors were contacted,

13       if there was anything out of character, but

14       he rode alone and acted alone, and all our

15       eyewitnesses told us he always alone, so the

16       scope didn't go beyond him.

17  Q.   So all the eyewitness were civilians?

18  A.   All the eyewitness were civilians.

19  Q.   And in addition to Michael Dara, two other

20       officers were terminated in 2009 or 2010, who

21       were they?

22  A.   When you say terminated, something might

23       have, an officer might have resigned.  I'm

24       thinking of Officer Patrick O'Malley, he

1   resigned, but he was going to be removed from

2   service.

3   Q.   Why was he going to be removed from service?

4   A.   He was going to be removed from service from

5        an incident that happened, the only job that

6        I investigated personally, but he was also

7        going to be removed from service as an issue

8        of progressive discipline.  He just had

9        numerous incidents that came to a head.

10  Q.   And what type of incidents were those?

11  A.   Well, he, one time he was working a paid

12       detail at the Brockton Hospital and

13       accidently discharged his firearm through

14       several walls.

15            And there were other, other things

16       that were in his jacket.  And I know that

17       there had been some, as we some spoke

18       earlier, even some undocumented discipline on

19       the shifts from supervisors.  He was

20       problematic.  He had been reassigned a couple

21       of times.

22  Q.   Were any of the incidents that he was

23       reported on related to discrimination type

24       issues?

1    A.    The incident that I investigated, I'd say,

2          would touch upon that.

3                    MS. SCHOFIELD:   So I requested

4          copies of all records of incidents of alleged

5          misconduct involving Lon Elliott, and I also

6          requested copies of all records of incidents

7          of alleged racial and ethnic discrimination

8          made against the city, which includes the

9          department and its officers, and it's clear

10         from this testimony that documents haven't

11         been produced.

12                   MR. PFAFF:   I will dispute that.

13         If you want to send me something in writing,

14         I'll be glad to investigate that.

15                   MS. SCHOFIELD:   Okay, I will do

16         that.

17   BY MS. SCHOFIELD:

18   Q.    So I want to talk about the Hispanic

19         community policy, do you remember that?   I'll

20         refresh your memory, Exhibit 3, I'll have you

21         take a look at that, page 103.

22   A.    Okay.

23   Q.    Have you had a chance to look at that?

24   A.    Yes.

1    Q.   And we spoke last time about that policy,

2         which it regards treatment of the city's

3         Puerto Rican population as part of the

4         broader community of Spanish speakers in

5         Brockton, how is that policy implemented?

6    A.   It's implemented that it appears in writing,

7         and every officer is made aware of it, and

8         it's part of a packet that every officer is

9         handed and ordered to familiarize themselves

10        with, and this was primarily addressing

11        generalities.

12   Q.   Has it ever been violated?

13   A.   I don't believe so.  This is just an issue

14        that we have.  We have more than one Hispanic

15        community, as I mentioned Ecuadorians before,

16        you know, we have a large Cape Verdean

17        community, and we have, as described here, as

18        addressed here, Hispanic, we have South

19        Americans, we have Central Americans, we have

20        Mexicans, and it's just to avoid any

21        generalities.

22   Q.   There's been a real demographic shift in

23        Brockton since about 2006, are you aware of

24        that?

1   A.   I'm not aware of any census or any changes

2        like that.  You know, Brockton has had a, I

3        grew up in Brockton.  I went to school in

4        Brockton.  It's always been a mixed

5        community.

6   Q.   How is that policy enforced?

7   A.   My interpretation of this is that this is

8        just to educate officers to avoid

9        generalities and to avoid offending any

10       community against another.

11  Q.   Who is responsible for reporting violations

12       of that?

13  A.   Any ranking officer, anything that comes

14       about, this would also address radio traffic,

15       things of that nature.  As I read this

16       personally, I just read this as a

17       professional standard thing for the officers

18       to be aware of, that there's certain groups

19       that are sensitive to that.

20  Q.   Sensitivity training almost, or guidance?

21  A.   Yes, in a sense, not to offend one community,

22       one specific community and not the

23       generalities.

24  Q.   Has anyone ever been reported as being

1        insensitive under that guideline?

2   A.   Not that I know of.

3   Q.   Has anyone ever been disciplined for it?

4   A.   Not that I know of.

5   Q.   When an officer fails to report an incident

6        of misconduct by another officer, how is the

7        officer disciplined?

8   A.   I don't understand what you're asking, you

9        mean, if an officer has knowledge?

10  Q.   Mm hmm, of an incident of misconduct by

11       another officer, and he doesn't report it and

12       the city finds out, what discipline is used

13       against the officer who fails to report it?

14  A.   I don't know of a specific incident that that

15       had happened, but I can tell you, from an

16       internal affairs perspective, we would look

17       at it as the officer who didn't report it was

18       just as guilty, if something had taken place,

19       and it would put him in a situation of more

20       of a joint venture, and the officer have to

21       answer for it also.

22  Q.   How would the department discover if an

23       officer has failed to report an incident of

24       misconduct?

1   A.   It could come up any number of ways, we're

2       talking in generalities.  It could come up

3       from the person making the allegation,

4       independent eyewitness, other police

5       officers, the command staff.

6   Q.   The officers who observed Mr. Elliott's

7       conduct toward Mr. Semedo weren't disciplined

8       for their failure to report the incident,

9       were they?

10   A.   The officers didn't observe any misconduct.

11       In fact, Mr. Semedo lauded the conduct of the

12       other officers, lauded.  And he never made an

13       allegation specifically to anyone, except Mr.

14       Elliott.

15   Q.   Okay, let's take a break, and then I think

16       I'm about done.

17            (A break was taken.)

18            MS. SCHOFIELD:  I'm all set, I

19       don't have any more questions.  Do you have

20       anything?

21            MR. PFAFF:  No, all set.

22            (Whereupon, the deposition was

23       concluded at 11:26 a.m.)

24